**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

JOSHUA HOFFMAN,

        Plaintiff,

vs.

AMERICOLD LOGISTICS, LLC,

        Defendant.

13-CV-75-LRR

**ORDER**

_____

### *TABLE OF CONTENTS*

I.     *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.    *PROCEDURAL HISTORY.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

III.   *SUBJECT MATTER JURISDICTION.* . . . . . . . . . . . . . . . . . . . . . . . . . *2*

IV.   *SUMMARY JUDGMENT STANDARD.* . . . . . . . . . . . . . . . . . . . . . . . . *3*

V.    *FACTUAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

    *A.    Parties.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *B.    Forklift Operation.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *C.    Work Rules Policy.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *D.    First Counseling.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *E.    The Accident.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
    *F.    Accident Reports.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
        *1.    Boyer's account.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
        *2.    Hoffman's account.* . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
    *G.    Subsequent Investigation.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
    *H.    Second Counseling.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    *I.    Third and Fourth Counseling.* . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    *J.    Workers' Compensation Benefits.* . . . . . . . . . . . . . . . . . . . . . . *11*
    *K.    Termination.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

VI.   *ANALYSIS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*

    *A.    Wrongful Discharge in Violation of Public Policy.* . . . . . . . . . . . . *12*
        *1.    The* Teachout *Test.* . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
        *2.    The* Davis/Lloyd *Test.* . . . . . . . . . . . . . . . . . . . . . . . *15*
        *3.    The* Jasper *Test.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

    **B.**       **Causation..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
            **1.**     **Parties' arguments.** . . . . . . . . . . . . . . . . . . . . . . . . . **19**
            **2.**     **Applicable law.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
            **3.**     **Application.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
**VII.**  **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

## I.  INTRODUCTION

The matter before the court is Defendant Americold Logistics, LLC's ("Americold") Motion for Summary Judgment ("Motion") (docket no. 17).

## II.  PROCEDURAL HISTORY

On July 8, 2013, Plaintiff Joshua Hoffman filed a one-count Petition ("Complaint") (docket no. 4) in the Iowa District Court for Linn County, Case No. LACV 078936.  In the Complaint, Hoffman alleges that Americold wrongfully discharged him in violation of Iowa public policy after he filed a workers' compensation claim.  On August 6, 2013, Americold removed the action to this court on the basis of diversity jurisdiction.  Notice of Removal (docket no. 2).  On February 7, 2014, Americold filed the Motion.  On March 3, 2014, Hoffman filed a Resistance (docket no. 20).  Americold did not file a Reply and the time to do so has now passed.  *See* LR 7(g).  Americold requests oral argument on the Motion, but the court finds that oral argument is unnecessary.  The Motion is fully submitted and ready for decision.

## III.  SUBJECT MATTER JURISDICTION

Hoffman is a resident of Cedar Rapids, Iowa, which is in Linn County.  Americold is a Delaware corporation with its principal place of business in Atlanta, Georgia.  The amount in controversy, including damages for back pay, lost benefits, front pay, pain and suffering, punitive damages and attorneys' fees, exceeds $75,000.  *See Kopp v. Kopp*, 280 F.3d 883, 884-85 (8th Cir. 2002) (stating that the amount in controversy is met "when a fact finder could legally conclude, from the pleadings and proof adduced to the court before trial, that the damages that the plaintiff suffered are greater than $75,000").

Therefore, the court is satisfied that it has subject matter jurisdiction over this dispute. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States . . . .").

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert. denied*, 132 S. Ct. 1144 (2012). "[U]nsupported, self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted).

If there is a genuine dispute about a material fact, the court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* at 586 (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## V.  FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Hoffman and affording him all reasonable inferences, the facts are these:

### A.  Parties

Hoffman began working for Americold in Cedar Rapids as a forklift operator on June 18, 2012.  Prior to working for Americold, Hoffman worked as a forklift operator for other companies.

Americold provides temperature-controlled warehousing and logistics to the food industry in the United States and internationally.  Americold operates a facility in Cedar Rapids, Iowa, that is attached to a food production plant operated by H.J. Heinz Co. ("Heinz").  Americold stores and ships refrigerated products, including boxes of bulk soup, which come into Americold's facility via conveyor from Heinz.

### B.  Forklift Operation

After pallets of soup travel via conveyor from Heinz's part of the building to Americold's part of the building, forklift operators receive and check in the pallets.  After receiving pallets from Heinz off the production line, forklift operators also pick product, stage product, load trucks and invert product, among other tasks.  The forklifts are powered by large batteries, which must be charged on a regular basis.

### C.  Work Rules Policy

Pursuant to Americold's work rules policy, employees may receive one or more points, at their supervisor's discretion, for incidents or policy infractions that result in verbal or written counseling.  Under the policy, employees who receive three points are subject to a suspension and employees who receive four points are subject to termination.

### D.  First Counseling

On October 17, 2012, Americold issued Hoffman a counseling ("First Counseling") because he did not receive and check in a pallet arriving on conveyor from Heinz while

working production on September 9, 2012. The First Counseling notified Hoffman that he received one point under Americold's work rules policy and that four points would result in termination.

### E. The Accident

On November 7, 2012, at approximately 7:30 p.m., Hoffman endeavored to change his forklift battery. Hoffman was trained from his first day of work not to disconnect a battery by pulling on the cables instead of the plug connections and Hoffman knew that pulling on the cables instead of the plug connections was against safety rules. While he was changing the battery, he saw a blue electrical flash and "giant spark[]s" flew into his eyes. Hoffman Accident Narrative, Americold Appendix ("Americold App'x") (docket nos. 17-3 through 17-6) at 87. Immediately after the accident, Hoffman went to his supervisor, Scott Boyer, for assistance. Boyer took Hoffman to the eye wash station and had Hoffman flush his eyes with water, and then Boyer took Hoffman to the break room. After a period of time, Hoffman's eyes were still burning and he wanted to get medical attention.

Boyer took Hoffman to Mercy Medical Center ("Mercy") where he was diagnosed with welder's burn, treated for a bruised cornea and released with a doctor's note advising him not to work for the rest of the day.

### F. Accident Reports

#### 1. Boyer's account

After taking Hoffman to Mercy and bringing him back to Americold, Boyer filled out a form entitled, "Supervisor's Report of an Accident." Supervisor's Report of an Accident ("Report"), Americold App'x at 86. In the Report, Boyer stated that an "[a]ssociate unplugged the battery by the wires not the connector." *Id.*

Boyer also wrote an Accident Narrative on November 7, 2012, which stated:

> On the night of 11/7/2012 at roughly 7:30 pm, . . .
> Hoffman approached me and explained that his eyes were

burning [due] to disconnecting a battery from the charger. He explained that while disconnecting the battery he may have not been firmly grasping the connectors and may have pulled on the cables. I immediately took him to the eye wash station and had him flush his eyes with water and proceeded to take him to the break-room to rest. After a period of time he wanted to seek medical attention as his eyes were still burning. I took him to Mercy Medical Center where he was treated and released with a doctor[']s note for no work the rest of the night.

Upon return to the facility I was worried how [Hoffman] would get home, but his girlfriend was already waiting for him.

I did examine the battery and found that a wire had been pulled from the connector and had signs of charging. At this time we have removed it from operation.

Accident Narrative, Americold App'x at 88-89. In his deposition, Hoffman repeatedly denied that he told Boyer that he may have pulled the cables rather than the plug connector. Hoffman Deposition, Americold App'x at 15-18. However, Hoffman did give the following answers at his deposition:

Q: Is it possible that you pulled on the wire instead of separating the plug?

A: No.

Q: Is it possible you said something to [Boyer] when you were kind of dazed that you don't remember?

A: I mean, I guess it could have happened, but I don't see why I would make a false statement like that. I mean, if I was dazed, I was dazed, but I don't—I guess I don't really understand where you're going with that.

*Id*. at 15-16.

### 2. *Hoffman's account*

Within one or two hours after his injury, Hoffman described the accident as follows:

> I Josh Hoffman went to charge my battery between 7:30 pm/8:00 pm[.] [I] went to collect and unplug my new battery ([which] was stiff) as I was unplug[g]ing the battery the one lead fell out and touched a couple diff[e]rent place[]s causing giant spark[]s to fly with blue flash[.] I was not pulling on wire[]s or st[r]aining them[.]

Hoffman Accident Narrative, Americold App'x at 87. Hoffman states that he included the part about him not pulling on the wires because "[Boyer] . . . had made a comment . . . about me pulling on the wires, and I think that's why I added that in there, is because I guess I know what I was doing and I know what I wasn't doing, and I was not pulling on the wires." Hoffman Deposition, Americold App'x at 17. At some point, Hoffman also filled out a form entitled, "Accident/Incident Investigation Review Questions," in which Hoffman indicated that he was following all the safety procedures when the accident occurred. Accident/Incident Investigation Review Questions, Americold App'x at 93. In the form, Hoffman did not indicate that he had just returned from a break prior to the accident or that he had been training anyone prior to the accident. *Id.*

### G. *Subsequent Investigation*

On November 8, 2012, a repair technician from Crown Lift Trucks fixed the battery charger. After consulting with the repair technician, who believed that someone pulling on the cables caused the accident, an investigative team from Americold consisting of Boyer, Andrew Black and Mark Caster determined that the accident was caused by Hoffman pulling on the cables of the battery rather than the connector. Hoffman admits that if one were to pull the cables instead of the connector to disconnect a battery, it may cause a similar reaction to what occurred at the time of the accident.

## H. Second Counseling

On November 8, 2012, after determining that Hoffman had not properly unplugged the battery, a representative from Americold filled out a form ("Second Counseling") that gave Hoffman his second point under the work rules policy.[1] The Second Counseling states:

> On the night of 11/07/2012 at roughly 7:30 pm . . . Hoffman was changing a battery and became injured . . . due to improperly disconnecting the battery from the charging unit. . . . Hoffman has been trained by staff on the correct way to change a battery and the proper use of . . . equipment including, but not limited to face shield, gloves, and apron. After [Hoffman] became injured he explained that he may not have been firmly grasping on the plastic terminal connectors and may have . . . pulled on the wires instead. After extensive investigation by our safety team it was found that [Hoffman] used the equipment improperly, and not only injured himself, but used equipment in a way that may have harmed fellow coworkers.

Second Counseling, Americold App'x at 105. The Second Counseling also noted that "[t]his brings [Hoffman] to 2 points under this policy. [Hoffman] has been on [leave of absence] since this instance and this counseling will be reviewed with him once he returns to work." *Id.* Hoffman did not receive notice of the Second Counseling until he returned to work on November 29, 2012.

## I. Third and Fourth Counseling

On November 8, 2012, Douglas Cozzolino, Americold's inventory analyst, was reconciling the previous day's production receiving. Cozzolino discovered that between 6:55 p.m. and 7:30 p.m. on the previous day, ten pallets had been received by employee

---

[1] Second Counseling is dated November 7, 2012, but it appears that the form was filled out on November 8, 2012. *See* Victoria Townsend Deposition, Americold App'x at 197. The parties have not provided the court with a signed copy of the Second Counseling.

#132195, Hoffman's employee identification number, using the wrong date. Cozzolino was able to tell that someone using Hoffman's identification number received the pallets because each forklift has its own RF scanning unit and an employee typically logs into the RF unit when he or she begins his or her shift. The date the product was manufactured matters because if a product is recalled, Americold needs to be able to track the product by production date.

Since these ten pallets were incorrectly dated, Cozzolino had to reverse receipt the pallets. While he was doing this, he noticed that none of the cartons on the ten pallets had any green tape on them. Americold uses green tape to cover the break in the seal of a carton of product that is created when an employee checks the product's temperature and to indicate that a temperature check has been performed. Americold's policy is that "[a] box must be opened and a temperature check must be taken on the first and last pallet of every run of an individual product." Production Line Training, Americold App'x at 172 (emphasis omitted). Cozzolino performed his own temperature check on the first pallet of the production run and obtained a reading of 29.2 degrees Fahrenheit. The person who received the first pallet on the previous day at 7:00 p.m. indicated that the temperature was 12.9 degrees Fahrenheit and indicated that the last pallet was 33 degrees at 8:13 p.m. The pallets were stored overnight at a temperature of 11 degrees Fahrenheit. Hoffman concedes that it would be impossible for a product to start out at 12.9 degrees Fahrenheit and end up at 29.2 degrees Fahrenheit after being stored overnight at 11 degrees Fahrenheit.

Later that day, Cozzolino e-mailed Erik Taber, Black, Boyer, Caster, Ryan Morse and Victoria Townsend the following:

> 650 cases [were] received LD2L05 and the date code is LD2L06. I had to reverse receipt the pallets out and received the pallets back in. While I was pulling pallets down[,] I noticed there was no [g]reen tape on the first pallet scanned in or any of the 10 pallets he had missed received in. On the

> Production Receiving Log . . . , [Hoffman] had noted that
> [t]he temperature [of] the pallet [was] at 12.9 degrees F for the
> first pallet and 33.0 F on the last pallet he received in of that
> item. When I open[ed] a case up to verify the product inside,
> I took a temperature reading, and the product is at 29.2
> degrees F.

Cozzolino E-Mail, Americold App'x at 323. As a result of this information, Americold imposed two additional points on Hoffman under the work rules policy, bringing Hoffman's total to four points. Hoffman did not receive notice that he had received two additional points until he returned to work on November 29, 2012.

Hoffman does not dispute Cozzolino's findings that there was no green tape and therefore that the person using Hoffman's identification number did not perform a temperature check on the November 7, 2012, pallet run. However, Hoffman states that he did not misdate the pallets or falsify the temperature readings because he is "pretty sure" he was on break at the time. Hoffman Deposition, Americold App'x at 26. Hoffman concedes that Americold's records show that from 6:55 p.m. to 7:27 p.m. on the night of November 7, 2012, someone using Hoffman's identification number was working the production line involving the misdated pallets for which there was not a temperature check. However, Hoffman contends that he was training someone—whose name Hoffman does not remember—that night and that he went on break around 6:55 p.m., leaving the trainee to keep working. In support of this argument, Hoffman contends that he could not have been the employee that inputted the false temperature because the final reading for the production run was entered at 8:13 p.m., which was after Hoffman's accident. Moreover, Hoffman notes that Townsend confirmed that when other employees misdate something, they do not always receive a point under the work rules policy.

According to Americold's records, in addition to Hoffman, there were only six other employees working at Americold's Cedar Rapids facility between 7:00 and 7:30 p.m. on November 7, 2012: Mike Johnson, Boyer, Pat Musel, Greg Bellach, Morse and Austin

Turner. The electronic work histories of these other six employees show that they were doing something else on their RF units—which means they were not working on the pallets in question—between 7:00 and 7:30 p.m. that night. Hoffman agrees that if Americold's records are accurate then none of the other six employees could have used his forklift and RF unit during the time period in question. With regard to a trainee using Hoffman's RF unit and identification number, Americold states that a trainee would use his or her own unique identification number when handling product. Hoffman contends that while a trainee should use his or her own number, this did not always happen.

### J. Workers' Compensation Benefits

At some point after the accident, Hoffman applied for and was granted workers' compensation benefits and received $600 in compensation from Americold's workers' compensation insurance company for the time he missed from November 7 to November 29, 2012. Nobody at Americold tried to block Hoffman from getting workers' compensation benefits or complained about the benefits that Hoffman received.

### K. Termination

On November 29, 2012, Hoffman was cleared to work and returned to work at Americold. After a brief safety meeting, Hoffman met with Townsend, Taber, Black and one other person. At the meeting, someone from Americold informed Hoffman that he was being disciplined for the events that occurred on November 7, 2012, and that his employment would be terminated. Americold did not provide Hoffman the opportunity to review Boyer's accident report prior to the meeting at which he was terminated. Americold did not issue Hoffman a written warning regarding his second point under the work rules policy prior to meeting with him on November 29, 2012. Americold also did not suspend Hoffman prior to terminating his employment, despite the stated penalty for a third point being a written counseling or suspension and the fact that all other employees have received a suspension prior to their termination pursuant to the work rules policy.

Hoffman indicates that he tried to explain himself with regard to the second point that Americold imposed—for improperly pulling the cables of the battery—but he does not remember exactly what he said. However, Hoffman concedes that he did not try to offer an explanation for the third and fourth violations—the misdating of the pallets and the failure to take the pallets' temperature. After being presented the counseling forms for his violations, Hoffman stated, "Just give me the pen, clearly I'm fired," and then he signed the termination form. Townsend sent a request to terminate Hoffman to general manager Steve Mitzel, regional human resources director Anne Main, regional vice president Joe Bardowski and local human resources associate Taber. Townsend consulted with Main before making the final decision to terminate Hoffman's employment.

## VI.  ANALYSIS

### A.  Wrongful Discharge in Violation of Public Policy

In Iowa, the "general rule is that an employee at-will can ordinarily be fired at anytime by an employer." *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 352 (Iowa 1989). However, "under proper circumstances [the Supreme Court of Iowa] . . . recognize[s] a common law claim for wrongful discharge from employment when such employment is terminated for reasons contrary to public policy." *Id.* (citing *Abrisz v. Pulley Freight Lines, Inc.*, 270 N.W.2d 454, 455 (Iowa 1978)). In *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558 (Iowa 1988), the Supreme Court of Iowa recognized a public-policy exception to the ordinary rule of at-will employment when an employee is discharged for filing a workers' compensation claim. *See id.* at 560-61; *see also Niblo*, 445 N.W.2d at 352 ("More recently, we adopted this public policy exception and applied it in a case where the discharge allegedly was due to the filing of a worker's compensation claim.") (citing *Springer*, 429 N.W.2d at 560-61); *accord Napreljac v. John Q. Hammons Hotels, Inc.*, 505 F.3d 800, 802 (8th Cir. 2007) ("Iowa common law provides a cause of action for an at-will employee who is discharged contrary to public policy, which includes being

discharged 'due to the filing of a workers' compensation claim.'") (quoting *Springer*, 429 N.W.2d at 560). Over time, the Supreme Court of Iowa has articulated different tests that an employee must satisfy to prevail on a wrongful discharge claim.

### 1. *The* Teachout *Test*

In *Teachout v. Forest City Comm. Sch. Dist.*, 584 N.W.2d 296 (Iowa 1998), the Supreme Court of Iowa articulated the elements of a wrongful discharge in violation of public policy claim. According to the Supreme Court of Iowa, a plaintiff must establish the following to prevail on a wrongful discharge in violation of public policy claim: "(1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two." *Id.* at 299. The *Teachout* court borrowed this test from Iowa civil rights law, in which a *prima facie* case of discrimination could be established by proving the preceding three elements. *See Hulme v. Barrett* (*Hulme II*), 480 N.W.2d 40, 42 (Iowa 1992) (applying framework in the context of age discrimination). With regard to the causation element, the Supreme Court of Iowa noted:

> The causation standard in a common-law retaliatory discharge case is high. . . . The employee's engagement in protected conduct must be the *determinative* factor in the employer's decision to take adverse action against the employee. . . . A factor is determinative if it is the reason that "tips the scales decisively one way or the other," even if it is not the predominant reason behind the employer's decision.

*Teachout*, 584 N.W.2d at 301-02 (quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)).

Americold cites the *Teachout* test as the applicable test to determine whether the court should grant the Motion. Americold goes on to state that if an employee can prove the elements of the *Teachout* test, then the employee has shown a *prima facie* case of wrongful discharge in violation of public policy. According to Americold, once the employee has shown a *prima facie* case, "the burden shifts to the employer to state a

legitimate, nondiscriminatory reason for the adverse action." Brief in Support of Motion (docket no. 17-1) at 13 (citing *Yockey v. State*, 540 N.W.2d 418, 422 (Iowa 1995)). If the employer meets this burden, Americold argues that "[t]he burden then shifts to the employee to prove that [the] reason proffered by the employer is false and a pretext for retaliating against the employee for filing a workers' compensation claim." *Id.* (citing *Yockey*, 540 N.W.2d at 422).

Hoffman does not dispute Americold's contention that the *Teachout* test and a burden-shifting framework apply to a wrongful discharge in violation of public policy claim. Rather, Hoffman argues that whether he has asserted a *prima facie* case is not the proper question at this stage of litigation. According to Hoffman, "[t]he proper analysis at this stage is 'whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim.'" Resistance at 3 (quoting *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000)).

The court notes that the Supreme Court of Iowa has never applied a burden-shifting framework to a wrongful discharge in violation of public policy claim. Although Americold cites *Yockey* for the proposition that a burden-shifting framework applies to this type of claim, a careful reading of *Yockey* leads to a different conclusion. In *Yockey*, also a workers' compensation case, the employee contended that "the burden-shifting analysis set forth in *Hulme v. Barrett* [(*Hulme I*)], 449 N.W.2d 629, 633 (Iowa 1989), should apply in all retaliatory discharge cases." *Yockey*, 540 N.W.2d at 422. The Supreme Court of Iowa stated:

> In *Hulme* [*I*], an age discrimination case, we stated that a plaintiff states a *prima facie* case of retaliatory discrimination when it is proven that (1) she was engaged in a statutorily-protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the two. Once the plaintiff has made a *prima facie* case of retaliatory discharge, the defendant must articulate a legitimate, nonretaliatory reason for the dismissal. If the defendant

14

> produces sufficient evidence of a reason other than retaliation,
> the plaintiff can still prevail if she can prove that the reason
> offered was merely pretextual. In the past, we have applied
> the shifting burden-of-proof analysis in our civil rights cases.
> *Landals v. George A. Rofles, Co.*, 454 N.W.2d 891, 893
> (Iowa 1990). She has not made out a *prima facie* case on her
> retaliatory discharge claim. Hence the case does not provide
> a basis for us to consider her contention concerning a shifting
> of the burden of proof.

*Id.* (emphasis added). The Supreme Court of Iowa in *Yockey* did not extend the burden-shifting framework of Iowa's civil rights law to wrongful discharge in violation of public policy claims because, even if it wished to do so, the employee failed to allow for such opportunity because she never made a *prima facie* case. Moreover, neither party has cited to any case and the court is not aware of any case in which Iowa courts have applied a burden-shifting framework to a wrongful discharge in violation of public policy claim. Accordingly, the court rejects the proposed *Teachout/Yockey* burden-shifting framework offered by Americold to resolve the Motion.

### 2. The **Davis/Lloyd** *Test*

In *Davis v. Horton*, 661 N.W.2d 533 (Iowa 2003), the Supreme Court of Iowa offered a new test:

> An employee asserting a wrongful-discharge claim based on
> violation of public policy must satisfy . . . all of the following
> factors:
>
> (1) The existence of a clearly defined public policy that
> protects an activity.
>
> (2) This policy would be undermined by a discharge from
> employment.
>
> (3) The challenged discharge was the result of participating in
> the protected activity.

(4) There was lack of other justification for the termination.

*Id.* at 535 (citing *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 (Iowa 2000)). The Supreme Court of Iowa identified these elements "as the clarity element, jeopardy element, causation element, and absence-of-justification element." *Id.* (citing *Fitzgerald*, 613 N.W.2d at 282). Although similar to the *Teachout* test, the *Davis* test not only required the employee to prove that he or she was discharged for participating in a protected activity but it also explicitly required an employee to show that there was lack of other justification for the termination. Because the court determined that the employee did not satisfy the clarity element, it did not address whether elements three and four in the *Davis* test, which both go to causation, were substantively different from the more general causation element articulated in *Teachout*.[2] *See id.* at 536.

In *Lloyd v. Drake Univ.*, 686 N.W.2d 225 (Iowa 2004), the Supreme Court of Iowa cited the *Davis* test as what must be shown "to succeed in [a] wrongful-discharge claim," but the court also cited the three-part *Teachout* test with approval, seemingly equating the two tests. *See id.* at 228. Again, however, the court declined to address whether elements three and four of the *Davis* test differed from element three of the *Teachout* test because the court determined that the employee had not satisfied the clarity element. *See id.* at 230. As such, following *Davis* and *Lloyd*, it was unclear whether the *Teachout* test

---

[2] To prove causation under *Teachout*, an employee was required to show that a reason in contravention to public policy was the "determinative factor"—one that "tips the scales decisively one way or the other"—in an employer's decision to terminate the employee. *See Teachout*, 584 N.W.2d at 301-02 (emphasis omitted) (internal citation omitted). It is not clear if this test differs from the *Davis* test, because in either test the employee must show that the reason he or she was terminated was for a reason in contravention to public policy rather than for some other legitimate justification. Whether the "absence-of-justification" element is a specific element the employee must show or whether it is encompassed in *Teachout*'s causation—or "determinative factor"—element may make no difference.

remained good law or whether the *Davis/Lloyd* line of cases added a new element that substantively changed the *Teachout* framework—the absence-of-justification element.

### 3. The Jasper Test

In *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751 (Iowa 2009), the Supreme Court of Iowa rearticulated the elements of a wrongful discharge in violation of public policy claim—particularly the fourth element—and cited the four-part *Davis* test that was reaffirmed in *Lloyd*. According to the Supreme Court of Iowa, the elements of a wrongful discharge in violation of public policy claim are:

> (1) existence of a clearly defined public policy that protects employee activity;
>
> (2) the public policy would be jeopardized by the discharge from employment;
>
> (3) the employee engaged in the protected activity, and this conduct was the reason for the employee's discharge; and
>
> (4) there was no overriding business justification for the termination.

*Id.* at 761 (citing *Lloyd*, 686 N.W.2d at 228); *see also Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013) (noting that "[a]n employee seeking protection under the public-policy exception in his or her wrongful-discharge claim must prove" the elements listed in *Jasper*). Later in the opinion, the Supreme Court of Iowa relies on *Teachout* and states:

> In addition to the existence of a public policy to create a protected activity, the tort of wrongful discharge requires proof that the discharge was a result of the employee's participation in the protected activity. This requirement is frequently identified as the *causation component* of the tort and requires the employee to show the protected activity engaged in by the employee was the 'determinative factor in the employer's decision' to terminate the employee.

*Id.* at 767 (emphasis added) (quoting *Teachout*, 584 N.W.2d at 301). The Supreme Court of Iowa concluded that the lower court erred by granting the defendant a judgment notwithstanding the verdict of the jury because "there was sufficient evidence that [the employee's refusal to act in contravention to a well-established public policy] was a cause of her discharge and that there was no overriding justification for the termination." *Id.* at 768. Given that the Supreme Court of Iowa reaffirmed as good law the *Teachout* causation standard and also determined that the lower court erred based on the third and fourth elements of *Davis*, the new four-element test articulated in *Jasper* does not appear to be substantively different from *Teachout* or *Davis*. In other words, although the elements of the test have changed from *Teachout* to *Jasper*, the test remains substantively the same.

Accordingly, the court concludes that to withstand summary judgment, Hoffman must present sufficient evidence that could lead a reasonable fact finder to find that he has satisfied each element under the *Jasper* test. However, pursuant to *Jasper*, which cited with approval the *Teachout* causation standard, if Hoffman presents sufficient evidence that could lead a reasonable fact finder to find Hoffman's applying for and taking workers' compensation was the determining factor in Americold's decision to terminate him, then he has met his burden under the *Jasper* test.

## B.  Causation

The parties do not dispute that Iowa has a clear public policy of prohibiting an employer from terminating an employee's employment for filing a workers' compensation claim and that this public policy would be jeopardized if an employer could discharge an employee for filing a workers' compensation claim. However, the parties dispute whether Hoffman has presented sufficient evidence for a reasonable fact finder to conclude that Hoffman's filing of a workers' compensation claim was the determinative factor in Americold's decision to terminate Hoffman's employment.

18

### 1. *Parties' arguments*

Americold argues that Hoffman has not presented sufficient evidence for a reasonable fact finder to conclude that Hoffman's filing of a workers' compensation claim was the determinative factor in Americold's decision to terminate Hoffman's employment. Specifically, Americold argues that the temporal proximity between Hoffman filing for workers' compensation and his termination, alone, is insufficient as a matter of law to satisfy the causation element. Americold contends that any inference of retaliation by Americold for Hoffman's filing of a workers' compensation claim is "broken by the intervening discovery of serious breaches of policy justifying termination." Brief in Support of Motion at 13.

Americold asserts that whether Hoffman actually violated safety rules when changing the battery, falsified a temperature or misdated several pallets "is not technically at issue in this litigation." *Id.* at 14. Rather, Americold contends that "[t]he pertinent question is whether Americold had a legitimate and good faith *belief* that [Hoffman] did [commit these violations], and whether this was the true motive for its decision to terminate his employment." *Id.* Americold argues that there is "ample, detailed evidence to show that Americold concluded that Hoffman had four separate policy violations, including falsifying temperature records, which is especially egregious," and that it terminated Hoffman "based on a progressive discipline system which the company followed to the letter." *Id.*

Americold also contends that to the extent Hoffman argues that Americold's asserted reason for terminating him—the four separate violations of the work rules policy—is pretextual and that he did not actually commit any of the final three violations, Hoffman "cannot rely on general denials and conjecture to defeat a motion for summary judgment." *Id.* at 16. Americold argues that "no reasonable fact finder could find for [Hoffman] based on the undisputed facts." *Id.*

Finally, Americold argues that Hoffman has not shown any evidence that Hoffman's applying for workers' compensation was a factor in Americold's decision to terminate Hoffman's employment. Americold notes:

> Nobody at Americold tried to block Hoffman from getting workers' compensation benefits, which totaled $600. . . . Nobody argued that he should not be entitled to benefits. . . . Nobody complained about the cost of benefits he received. . . . According to [Hoffman], his claim in this lawsuit 'does not even have to do with his application for workers' compensation benefits.' . . . Hoffman does not believe any individual person at Americold had it out for him or tried to get him fired.

*Id.* at 17 (quoting Hoffman Deposition, Americold App'x at 6-7). Accordingly, Americold argues that the court should dismiss Hoffman's case because he has "failed to allege sufficient facts to show a causal connection between the request for workers' compensation benefits and the termination." *Id.* at 18.

In response, Hoffman argues that the issue is not whether he can establish a claim of wrongful discharge in violation of public policy, but "'whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim.'" Resistance at 3 (quoting *Kampouris*, 210 F.3d at 847). Hoffman claims that "at this stage [he] need not prove all elements of his claim, [but] must merely show there is sufficient evidence to create a genuine issue of material fact . . . regarding the true reason [Americold] fired [Hoffman]." *Id.*

Specifically, Hoffman argues that there is a genuine dispute about the following facts: (1) whether Hoffman told Boyer, as Boyer indicated in his report, that he improperly disconnected the forklift battery, *id.*; and (2) whether Hoffman was fired for reporting a work injury or seeking workers' compensation benefits, or, whether he was fired for receiving four points under the work rules policy, *id.* at 5. Hoffman asserts that: (1) he did not tell Boyer that he improperly disconnected the forklift battery; (2) he provided a

written statement on the night of the accident that indicated he followed proper safety procedures; (3) his testimony in his deposition is consistent with his prior statements; and (4) no one witnessed him improperly unplug the battery. With respect to these issues, Hoffman contends that "because [Americold] conceded [that Hoffman] should not receive a point if he properly disconnected the forklift battery, it remains a question for the jury whether [Hoffman] should have been issued his second point under the [w]ork [r]ules [p]olicy." *Id.* at 4.

Hoffman argues that his third and fourth points under the work rules policy are irrelevant because he has shown a genuine issue of material fact as to his second point. Moreover, Hoffman notes that Americold has conceded that points under the work rules policy are discretionary and that errors similar to what led to his third and fourth points have been made in the past that have not led to Americold assessing points under the work rules policy. Hoffman claims that the only reason these errors led to points in his case was because he was injured and he filed a workers' compensation claim. Hoffman also argues that Americold failed to follow its work rules policy by terminating him before suspending him, because every other employee was suspended under the work rules policy before being terminated. Hoffman argues that this shows that "[Americold's] allegations that [Hoffman's] second point was issued for a safety violation is pre[]text[ual] and [Hoffman] was actually fired due to his seeking of workers' compensation benefits." *Id.* at 7.

### 2. *Applicable law*

"In tortious discharge cases, the causation standard is higher than in discrimination cases." *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009). "The employee's engagement in protected conduct must be the *determinative* factor in the employer's decision to take adverse action against the employee." *Teachout*, 584 N.W.2d at 301. "A factor is determinative if it is the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision." *Id.*

(quoting *Smith*, 464 N.W.2d at 686). "[T]he existence of other legal reasons or motives for the termination are relevant in considering causation." *Fitzgerald*, 613 N.W.2d at 289.

"Generally, causation presents a question of fact." *Id.* "Thus, if there is a dispute over the conduct or the reasonable inferences to be drawn from the conduct, the jury must resolve the dispute." *Id.* "Additionally, any dispute over . . . the existence of other justifiable reasons for the termination" is "generally for the jury." *Id.* However, the Supreme Court of Iowa noted in *Teachout* that in *Hulme II*, the Supreme Court of Iowa "affirmed a judgment in favor of the employer on the employee's retaliatory discharge claim because the employee had failed to introduce sufficient evidence to support the causation element of her claim." *Teachout*, 584 N.W.2d at 302 (citing *Hulme II*, 480 N.W.2d at 43). Moreover, "the timing between the protected activity and the discharge is insufficient, by itself, to support the causation element of the tort." *Jasper*, 764 N.W.2d at 768. For example, the Supreme Court of Iowa also noted in *Teachout* that in *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198 (Iowa 1997), the Supreme Court of Iowa "held the fact that [the employee's] termination followed the filing of his grievance was insufficient to generate a jury question on retaliation. . . . [The Supreme Court of Iowa] pointed out the employee's unacceptable performance and repeated disciplinary problems were legitimate reasons for his discharge." *Teachout*, 584 N.W.2d at 302 (citing *Phipps*, 558 N.W.2d at 203).

### 3. *Application*

In this case, the court concludes that based on the evidence in the record, no reasonable fact finder could conclude that Hoffman's filing of a workers' compensation claim was the determinative factor in Americold's decision to fire him. Although there are genuine issues of fact, none of these issues are material to the issue of whether Hoffman's filing of a workers' compensation claim was the determinative factor in Americold's decision to fire him. The issue is not whether Hoffman actually pulled out the battery by

the cables, whether he told Boyer he pulled out the battery by the cables or whether Hoffman actually committed the third and fourth offenses under the work rules policy. Rather, the issue is whether Hoffman's filing of a workers' compensation claim was the determinative factor—i.e., the factor that "'tips the scales decisively one way or the other'"—in Americold's decision to fire Hoffman. *Teachout*, 584 N.W.2d at 301 (quoting *Smith*, 464 N.W.2d at 686).

Hoffman presents scant evidence that Americold terminated his employment for filing a workers' compensation claim. It is undisputed that once Hoffman notified Boyer he was injured, Boyer attempted to treat Hoffman's injury and, when Hoffman's injury persisted, Boyer took Hoffman to a local hospital. In his deposition, Hoffman affirmed that he applied for workers' compensation, received workers' compensation to pay for all his medical bills, received benefits for the days he was not able to work, never argued that he should receive more workers' compensation benefits, never was discouraged to apply for workers' compensation benefits, never was told that he was not entitled to benefits, never heard anyone complaining about the costs of the benefits and never thought any person was out to get him fired. Moreover, Hoffman presents no evidence whatsoever that anyone at Americold had any animus toward people who apply for workers' compensation. Hoffman's only evidence to link his termination with his filing of a workers' compensation claim is the timing of the events, and Iowa law is clear that this, alone, is not sufficient evidence to support the causation element of his claim. *See Phipps*, 558 N.W.2d at 203.

Rather, the determinative factor in Americold's decision to terminate Hoffman's employment—and the overriding business justification for doing so—was because, based on Americold's investigation, Hoffman had four violations under the work rules policy, and three of them occurred on the same day. A reasonable fact finder could determine that Hoffman did not tell Boyer that he pulled the cables of the battery and that, in fact, Hoffman properly unplugged the battery (despite the independent investigator determining

that someone pulled on the cable), but from the perspective of Americold, it appeared that Hoffman had improperly disconnected the battery, which made it reasonable for them to assess Hoffman's second point under the work rules policy. With regard to the third and fourth points, all of Americold's data logs indicated that it was Hoffman—and not some unknown trainee—who committed the final two violations. No reasonable fact finder could find that it was a trainee—rather than Hoffman—that committed the final two violations given that: the errors were made under Hoffman's identification number; Hoffman never mentioned that he was on break or that he had been training someone prior to his accident until discovery, even when he had been given an opportunity to explain his third and fourth violations on the day he was terminated; Hoffman could not remember the name of the trainee who had allegedly made the mistake and Americold's records indicate that there was no other employee in the building at that time—except for Hoffman—that could have committed these final two violations of the work rules policy. From Americold's perspective, Hoffman committed three serious errors on the night he was injured, which, in addition to his first undisputed point under the work rules policy, gave Hoffman four points under the work rules policy and resulted in his termination.

Hoffman asserts that Townsend conceded that other workers do not always receive a point under the work rules policy when they misdate pallets and it was unfair that he was given a point for doing so. However, given that Americold believed that Hoffman committed at least one serious violation—improperly disconnecting the battery—that put his life and others' lives in danger and that he displayed a pattern of behavior in contravention to Americold policy, Americold was justified in assessing a point to Hoffman for misdating the pallets. *See id.* (noting that a close proximity in time from the employee engaging in the protected activity and the employee's termination is not sufficient evidence to support a retaliation claim when "[t]he record reflects that [the employee] was discharged because of his unacceptable performance and repeated disciplinary problems").

Hoffman also contends that other workers were suspended after receiving a third point under the work rules policy and that Americold did not suspend him prior to terminating him. However, because Americold discovered the third and fourth violations at the same time, rather than separately, Americold had no reason to suspend Hoffman when his behavior warranted termination.

Since Hoffman has presented no evidence, except for temporal proximity, that his filing for workers' compensation was the determinative factor in Americold's decision to terminate his employment, no reasonable fact finder could find in favor of Hoffman.

## VII. CONCLUSION

In light of the foregoing, Americold's Motion (docket no. 17) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Americold Logistics, LLC and against Joshua Hoffman, to satisfy all pending motions as moot and to **CLOSE THIS CASE**.

**IT IS SO ORDERED.**

**DATED** this 26th day of March, 2014.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA